UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOSE BARAJAS, JR.,

Petitioner,

v.

DAVID BAUGHMAN, Acting Warden,
California State Prison, Sacramento,

Respondent.

No.  1:13-cv-02000-DAD-SKO  HC

**FINDINGS AND RECOMMENDATION
TO DENY PETITION FOR WRIT OF
HABEAS CORPUS AND DECLINE TO
ISSUE CERTIFICATE OF
APPEALABILITY**

Petitioner Jose Barajas, Jr., is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges seven grounds for habeas relief: (1) the prosecutor's *Doyle*[1] error violated due process; (2) denial of the new trial motion violated due process; (3) the erroneous imminent peril jury instruction misstated applicable law; (4) insufficient evidence of murder violated his due process; (5) victim restitution should be designated to be a joint and several liability; (6) cumulative error; and (7) ineffective assistance of counsel.  Having reviewed the record as a whole and applicable law, the undersigned recommends that the Court deny the habeas petition.

///

///

---

[1] *Doyle v. Ohio*, 426 U.S. 610 (1976).

1

I.      **Factual Background**[2]

A.      **In General**

The incident giving rise to Petitioner's conviction occurred on August 18, 2007, when two groups of men encountered each other in a liquor store parking lot in which taco trucks were gathered.  After purchasing food at a white taco truck, Petitioner and codefendants Nicholas Castenada and Steven Anthony Pack encountered another group (the "soccer group"[3]) , which was on its way home from an evening spent partying and dancing.   Petitioner and the co-defendants addressed the soccer group with various insults including the term "scrap," a derogatory reference to members of the Sureño street gang.  When a verbal argument ensued, Castenada pulled a gun from his waistband, and a member of the soccer group attempted to calm things down, characterizing the group members as "paisas" and explaining that they did not "bang."

The soccer group withdrew toward the black taco truck, and Petitioner, Castenada, and Pack got into a white Honda Civic.  Castenada backed the Civic slowly past the group at the black truck.  Pack, standing in the open front passenger door, stated, "We got you"; and Petitioner fired a 22-caliber revolver through the window of the back seat into the soccer group.  Shot in the head, Kevin Argueta fell to the ground, having incurred a fatal wound.[4]

The Civic sped away.  Garcia and Lopez gave chase in Garcia's green Honda.  When the green Honda came within 37 feet of the white Civic, Petitioner opened fire.  Garcia took evasive action and ultimately returned to the taco trucks.

---

[2] Factual information is derived from *People v. Pack*, 2012 WL 1958866 (Cal.App. May 31, 2012) (No. F061140), and the review of the record by the undersigned.

[3] Testimony indicated that many of the members of this group knew each other from having played together on various soccer teams in recent years.  This group included brothers Miguel and Daniel Oseguera, Kevin Argueta, Moises Garcia, Marvin Lopez. Julio Amezcua, and Bayron Gutierrez.

[4] Gutierrez' finger was wounded in the altercation.  He was treated at the hospital and released.  The source of his wound was uncertain.  Gutierrez testified that he had been struck by a bullet; the defendants argued that he had simply been cut in the course of the altercation.

On August 22, 2007, Pack was arrested pursuant to a warrant.  Petitioner turned himself in after hearing a news report naming him as a suspect.  Castaneda was arrested August 29, 2007.

The white Honda Civic, which belonged to Castenada, was located in a garage with its tires and wheels removed.  Police found a live .22 caliber cartridge under the front passenger floor mat and a spent .22 caliber shell casing under the front passenger seat.

**B.    Gang Expert Testimony**

Detective Francisco Soria testified as a gang expert.  Previous testimony indicated that Castenada had claimed to be a Norteño gang member at the age of fourteen.  Soria explained his reasons for concluding that all three co-defendants were Norteños.  He opined that the shooting was intended to benefit the Norteños by punishing the victims for not backing down when confronted.  Nothing indicated that Argueta or any member of the soccer group was a member or associate of a gang.

**C.    Defense Testimony**

Each of the defendants denied belonging to a gang.  According to the defendants, they had been watching football before going to the taco truck to get something to eat.  When they arrived, Pack recognized two individuals in the other group (Daniel and Miguel Oseguera), whose father had been involved in an auto accident with a member of the Barajas family.  He called out, "When are you going to pay my boy his money?" but no one answered him.

At trial, the defendants testified that the soccer group had been the aggressors.  They said that after the defendants bought their food and headed for the car, the Oseguera brothers and Amezcua approached them and began yelling.  The other five members of the soccer group approached from another direction to surround the defendants.  Castenada testified that when he realized that the other group was acting aggressively, he pulled out his .22 caliber revolver and told them to get back.  Defendants then got into their car and began to drive away.  Petitioner

3

fired two shots.  He testified that he fired the first shot into the ground to prove that the gun was real, and then, after someone made a move "like he was going to lift his shirt up" to get a weapon, Petitioner fired the second shot, which struck Argueta.

### D.    Videotape of Incident

The incident was captured by a security camera in front of Corona Liquors.  When shown the video tape at trial, various witnesses identified themselves and others, and explained the events depicted in the videotape.  Petitioner and the co-defendants were already at the white taco truck, opposite Corona Liquors, when Miguel and Daniel Oseguera and Julio Amezcua arrived at 12:33:38[5] and parked just south of the white taco truck, across from the black taco truck parked to the south of Corona Liquors.  At 12:34:49, Pack stepped away from the white truck and turned to look toward the black truck or Castenada's car, which was parked several spaces south of the black truck.  Defendants left the white truck and began walking toward the black truck or Castenada's car at 12:35:44, at which time Amezcua and the Oseguera brothers stood in front of the black truck, waiting to place their order.  At 12:35:50, Garcia's green Honda, carrying the other members of the soccer group, arrived from the north, drove past both taco trucks and parked in a space to the south of the black truck.

The prosecutor pinpointed 12:36:24 as the start of the argument.  By that time, the defendants were in front of the black truck, and the Osegueras and Amezcua had stepped away from the truck toward them.  By 12:36:45, other people in the vicinity showed awareness of the argument.

At 12:37:50, the back-up lights on Castenada's car appeared as it backed out of its parking space to a point roughly even with the soccer group, which was located near a white van parked immediately to the south of the black truck.  The first shot was fired at 12:38:00, as evidenced by

---

[5] Testimony indicated the incident began at about 1:30 a.m.  The time stamp on the security tape appears to be one hour earlier (i.e., standard time rather than daylight savings time), and does not reflect an a.m. or a p.m. notation.

4

a bystander dropping down to shelter behind his pick-up truck, which was parked in front of Corona Liquors.  By 12:38:08, the bystander stood up, and others were fleeing the scene.  Cars were able to travel the aisle between the taco trucks toward exits at the north and south of the parking lot.  At 12:38:17, the bystander again dropped behind his pick-up truck as one or more additional shots were fired.  (Although not visible on the video, at this point, Argueta was struck by a shot and fell dead behind the white van.)  Sheriff's Deputies Andrew Lawder and Cory Brown arrived at the scene at 12:42:13.

## II.   **Procedural History**

Petitioner, Castenada, and Pack were charged with one count of murder (Cal. Penal Code § 187), nine counts of attempted murder (Cal. Penal Code §§ 187 and 664), two counts of assault with a firearm (Cal. Penal Code § 245(a)(2)), one count of discharge of a firearm (Cal. Penal Code § 246), participation in a street gang (Cal. Penal Code § 186.22(a)), and various enhancements.  Pack moved to set aside the information pursuant to California Penal Code § 995.  Following a hearing in January and February 2009, the trial court found insufficient evidence (1) that defendants were aiding, abetting, or participating in a criminal street gang; (2) that the charged incident was gang related; and (3) that the predicate acts were sufficient to support a reasonable suspicion of active gang participation.  With regard to Petitioner, the trial court dismissed count 14 which charged participation in a criminal street gang.

On April 10, 2009, Respondent filed a petition for writ of mandate.  On May 28, 2009, the Court of Appeal issued the writ of mandate and directed the Superior Court to deny Pack's § 995 motions.  *People v. Superior Court of Stanislaus County (Steven Anthony Pack)*, 2009 WL 1497468 at 2 (Cal. Ct. App. May 28, 2009) (No. F057347).

During a total of 31 days in January and February 2010, Petitioner and the two co-defendants were tried jointly before a jury.  Each defendant had his own counsel.  At trial,

Petitioner, who had remained silent following his arrest, stated for the first time that he had shot from the white Civic into the soccer group at the taco truck.

On February 4, 2010, the jury found all three defendants guilty of second-degree murder, two counts of assault with a firearm, and negligent discharge of a firearm. Only Castenada was found guilty of active participation in a street gang. The jury found the defendants not guilty of two of the attempted murder counts, the count of intentionally shooting at an occupied vehicle, the gang enhancement appended to the murder charges, and gang participation. The jury deadlocked on the other gang enhancements and seven of the attempted murder counts. The trial court declared a mistrial on the attempted murder counts and struck the enhancements on which the jury did not reach a verdict.

On September 17, 2010, the trial court denied Petitioner's and Pack's motions for a new trial. The Superior Court sentenced Petitioner to a term of 40 years to life in prison.

Petitioner appealed the convictions to the State Court of Appeals, Fifth Appellate District, which affirmed the convictions in all regards on May 31, 2012. The California Supreme Court summarily denied the appeal on September 12, 2012.

On December 6, 2013, Petitioner filed a petition for writ of habeas corpus in this Court. After Respondent filed his answer, Petitioner moved for an order of stay and abeyance to permit him to exhaust claim 7 (ineffective assistance of counsel). The Court denied the motion for stay and abeyance on September 11, 2015.

## III.   **Standard of Review**

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which

applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. The Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court

must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

## IV.   Prosecutorial Comment on Petitioner's Post-Arrest Silence

As his first ground for relief, Petitioner contends that his due process rights were violated when, after Petitioner testified that he had fired into the soccer group from the rear seat of Castenada's car, the prosecutor asked Petitioner whether this was the first time he had told his story.  Petitioner adds that the prosecutor repeated this error in his closing.

### A.   Procedural and Factual Background

For the first time at trial, Petitioner testified that after he heard a comment that Castenada's gun was a toy, he grabbed the gun from the center console of the car and fired into the ground "to show them it was real."  8 RT 1733:6-7.  After telling Castenada to get going, Petitioner testified that he fired again to scare off the soccer group, some of whom were touching Castenada's car.  Although he tried to shoot away from the group, the shot struck and

///

8

killed Argueta.  Petitioner testified he also shot at Garcia's car when it followed them from the parking lot.

On cross-examination, the prosecutor asked Petitioner whether Petitioner's testimony was the first time "we've had the opportunity to hear . . . your version of the facts of this case." 8 RT 1803:12-19.  Castenada's counsel quickly objected and requested a sidebar.  Following an off-the-record discussion, the Court upheld the objection, and the prosecutor asked no further questions.  Pack's counsel then asked Petitioner whether he had requested an attorney following his arrest: Petitioner answered, "Yes, sir."  8 RT 1804:5-7.  The defense then rested.

As a result of Petitioner's testimony that he had shot from Castenada's car, the trial court modified the complaint and the jury instructions to conform to the evidence.  In his closing argument, Petitioner's counsel, Ben Jacob, criticized the prosecution for changing its theory of the case.  The prosecutor responded to Jacob's closing, explaining that until Petitioner testified at trial that he had been the defendant who shot from the white Civic, the prosecutor had no basis to charge that Petitioner had been the shooter.

Following the prosecutor's rebuttal statement, and outside the presence of the jury, all three defense attorneys objected to the prosecutor's comment on Petitioner's post-arrest silence. The trial court overruled the objection, stating (1) that the prosecutor's remark in closing did not refer to Petitioner's silence at arrest, and (2) that the statement fairly responded to Jacob's closing by explaining which charges had been modified.  Defense attorneys declined the trial court's offer of a mistrial and did not ask the trial court to admonish the jury.

### B.     State Court Opinion

The Court of Appeals concluded that because only Castenada made contemporaneous objections to the prosecutor's cross-examination of Petitioner and the rebuttal argument, Petitioner and Pack had forfeited this issue.  *Pack*, 2012 WL 1958866 at *6.  The court added

that it expressed no opinion "on the standing of Pack to make this objection concerning the

testimony of Petitioner and Castenada, or of Petitioner's standing to make this objection

concerning the testimony of Castenada." *Id.* at *7.

The state court similarly rejected the claim regarding the prosecutor's rebuttal:

> We are also not convinced this brief and mild reference in rebuttal
> prejudiced Pack or [Petitioner].  (*People v. Coffman and Marlow*
> (2004) 34 Cal. 4th 1, 66.)  If Pack or [Petitioner] wishes to pursue
> ineffective assistance of counsel, he will need to do so by way of a
> writ petition.  It has been said on numerous occasions that a claim
> for ineffective assistance of counsel is more properly addressed in a
> petition for writ of habeas corpus.

*Pack*, 2012 WL at *7.[6]

### C.   Procedural Default

A federal district court cannot hear a petition for writ of habeas corpus unless the highest

state court has had a full and fair opportunity to hear a claim.  28 U.S.C. § 2254(a).  When a state

prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate

state procedural rule, federal habeas review of the claim is barred unless the prisoner can

demonstrate cause for the default and actual prejudice as a result of the alleged violation of

federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Failure to observe California's "contemporaneous objection" rule "results in a procedural

default unless the petitioner can demonstrate 'cause' for his failure to raise the question at trial,

and 'prejudice' arising from the error."  *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981),

(quoting *Wainwright v. Sikes*, 433 U.S. 72, 87 (1977)).  A "contemporaneous objection rule

serve[s] strong state interests in the finality of its criminal litigation."  *Coleman*, 501 U.S. at 746-

47.  As a result, the cause and prejudice standard imposes a high bar, applying "even in cases in

which the alleged constitutional error impaired the truthfinding function of the trial."  *Id*. at 747.

///

---

[6] Despite the state court's explicit direction that Petitioner pursue his claim of ineffective assistance of counsel in a
state habeas proceeding, Petitioner did not do so.  Instead, Petitioner first asserted a claim of ineffective assistance of
counsel in this petition (claim 7).

1  The contemporaneous objection rule constitutes an "independent and adequate state ground
2  barr[ing] federal habeas . . . absent a showing of cause and prejudice." *Id.*

3  Petitioner contends that the prosecutor's cross-examination prejudiced him in that it
4  sought to attribute Petitioner's post-arrest silence to fabrication of the defense.  In reading the
5  record, however, it does not appear that the cross-examination question was intended to suggest
6  fabrication.  Until Petitioner testified, the testimony suggested that co-defendant Pack had been
7  the shooter, firing the pistol while standing in the front passenger doorframe.  Petitioner's surprise
8  testimony was a bombshell that likely rendered the prosecutor's planned cross-examination
9  inappropriate.

10  Even if the prosecutor misspoke following Petitioner's unexpected testimony, questioning
11  whether Petitioner had previously given his story was inappropriate even though it did not
12  explicitly characterize Petitioner as having invoked his right to remain silent.  Codefendant
13  Castenada's attorney quickly objected, however, and the trial court promptly sustained the
14  objection.  The prosecutor asked no further questions.  In light of this limited reference in the
15  course of a long trial, the state court did not unreasonably find the question brief, mild, and likely
16  harmless.

17  Petitioner provides no rationale for his claim that failure to request a curative instruction
18  constituted deficient representation or resulted in prejudice.  The prosecutor's objectionable
19  question was a brief moment in a nearly two-month-long trial.  Since a curative instruction would
20  have emphasized the very impermissible information the defense sought to exclude, counsel may
21  well have made a tactical decision not to request one.

22  Petitioner's claim that the *Doyle* violation was impermissibly renewed during the course of the
23  prosecutor's closing is also not compelling. As a result of Petitioner's testimony that he had shot from
24  the white Civic (the prosecution had previously alleged that co-defendant Pack had fired the gun from
25  the vehicle), the prosecutor amended the complaint and modified the jury charge request to conform
26  to the evidence elicited at trial. In his closing argument, Petitioner's trial counsel criticized the
27  prosecution for changing its theory of the case. As a result, the prosecutor responded to trial counsel's
28  closing, explaining that until Petitioner testified at trial that he had been the defendant who shot from

11

1    the white Civic, the prosecution had no basis to consider that Petitioner might have been the shooter.

2              Counsel objected outside the presence of the jury that the prosecutor had again attacked

3    Petitioner's Fifth Amendment right to remain silent. The trial court overruled the objection, stating

4    that (1) the prosecutor's remark in closing did not refer to Petitioner's silence at arrest and (2) the

5    statement fairly responded to the trial attorney's closing in explaining which charges had been

6    modified.  The defense attorneys declined the Court's offer of a mistrial and did not ask the Court to

7    admonish the jury.

8              The undersigned agrees with Respondent that the interchange at closing was separate from the

9    prosecutor's *Doyle* error during cross examination. Taken in context, the prosecutor's rejoinder was an

10   invited response to trial counsel's "opening salvo."  *See United States v. Young*, 470 U.S. 1, 12

11   (1985); *United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005).  As a result, even if this

12   claim were not procedurally barred, a state court could reasonably conclude that the alleged *Doyle*

13   violations did not result in undue prejudice.

14             The Court should decline to reach this procedurally barred claim.

15   **V.      Inflammatory Gang Evidence**

16             As the second ground for habeas relief, Petitioner contends that the trial court violated his

17   Fifth and Fourteenth Amendment due process rights by denying the motion for a new trial to

18   remedy inflammatory and irrelevant gang evidence.  Although the jury acquitted Petitioner of the

19   charge of active participation in a street gang, Petitioner argues that the gang evidence irreparably

20   tainted the trial.  Respondent characterizes Petitioner's challenge to denial of a new trial as

21   primarily a state law issue of evidence.

22        **A.      New Trial Motion**

23             In the new trial motion to the trial court, Petitioner relied on *People v. Albarran*, 149 Cal.

24   App. 4th 214, 230 (2007), for the proposition that the admission of irrelevant gang evidence

25   violated federal due process and rendered trial so fundamentally unfair that it violated due

26   process.

27             The trial court denied the new trial motion.  The court distinguished Petitioner's case from

28   *Albarran*, and noted that, in its earlier review of the § 995 determination, the Court of Appeal

12

"held that there was sufficient evidence for the case to proceed to trial regarding the gang charges." 12 RT 2629. *See Superior Court of Stanislaus County (Steven Anthony Pack)*, 2009 WL 1497468. The trial court pointed out that it had excluded evidence that the prosecution had "very badly" wanted to present, even though reversal would have been unlikely if the evidence had been admitted. It found the jury's inability to reach a verdict on the gang enhancements likely attributable to the greatly attenuated gang evidence admitted into evidence.

**B.    Court of Appeals**

The Court of Appeals also distinguished this case from *Albarran*, finding that the gang evidence admitted in this case was directly relevant to proving the gang-related criminal charges. *Pack*, 2012 WL 1958866 at *8. It held that, under California Evidence Code § 352, the trial court did not abuse its discretion in admitting evidence regarding Petitioner's and Pack's participation in a criminal street gang. *Id.*

The Court of Appeal also found that since the jury acquitted Petitioner and Pack of the count of participating in a criminal street gang and deadlocked on the gang enhancements, it was unlikely that the gang evidence was unduly inflammatory: "If . . . the jury was not convinced of Pack's and [Petitioner's] gang affiliations, the jury would have no reason to allow gang evidence to influence its assessment of appellants' guilt of other charged offenses." *Id.* Further, the jury convicted the defendants of the lesser-included offense of second degree murder rather than first degree murder as charged. *Id.* The court held that Petitioner and Pack failed to prove that (1) the trial court abused its discretion in admitting the gang evidence and (2) admitting the gang evidence created undue prejudice. *Id.*

**C.    No Due Process Violation**

Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995).

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

13

1   review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6

2   (1983).  "Although the [U.S. Supreme] Court has been clear that a writ should be issued when

3   constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375

4   . . . , it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

5   constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at

6   1101.  Since the state appellate court's disposition of Petitioner's appeal was not contrary to or an

7   unreasonable application of Supreme Court precedent, a federal district court may not grant the

8   writ based on the trial court's admission of evidence relating to Petitioner's gang-related

9   activities.

10        The Court should not reach this issue.

11  **VI.   Jury Instructions**

12        Referring to Pack's claims relating to the jury instructions on self-defense, Petitioner

13  contends that an erroneous imminent peril jury instruction misstated applicable law and wrongly

14  eliminated his defenses of self-defense and imperfect self-defense.  Respondent replies that this

15  claim is a state law issue that is binding on the federal court and that in any event, the instruction

16  had little or no negative effect on the jury's verdict.

17        **A.   Federal Habeas Review of Jury Instruction Errors**

18        Generally, claims of instructional error are questions of state law and are not cognizable

19  on federal habeas review.  "It is not the province of a federal court to reexamine state court

20  determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  "The fact

21  that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief."

22  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "[A] petitioner may not transform a state-law

23  issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110

24  F.3d 1380, 1389 (9th Cir. 1997) (internal quotation marks omitted).

25        To prevail in a collateral attack on state court jury instructions, a petitioner must do more

26  than prove that the instruction was erroneous.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

27  The petitioner must prove that the improper instruction "by itself so infected the entire trial that

28  the resulting conviction violated due process." *Estelle*, 502 U.S. at 72.  And even if there were

14

1    constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on

2    the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

3         A federal court's review of a claim of instructional error is highly deferential. *Masoner v.*

4    *Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction

5    in isolation but must consider the context of the entire record and of the instructions as a whole.

6    *Id.* The mere possibility of a different verdict is too speculative to justify a finding of

7    constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based

8    upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict

9    unless 'there is a reasonable likelihood that the jury has applied the challenged instruction in a

10   way' that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting

11   *Estelle*, 502 U.S. at 72).

12        Even when the trial court has made an error in the instruction, a habeas petitioner is only

13   entitled to relief if the error "had a substantial and injurious effect or influence in determining the

14   jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

15   (1946)). A state prisoner is not entitled to federal habeas relief unless the instructional error

16   resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. A violation of due process occurs only

17   when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at

18   72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the

19   error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v.*

20   *McAninch*, 513 U.S. 432, 437 (1995).

21   **B.    Imminent Peril**

22        Contending that the trial court's instruction on imminent peril obviated his defenses of

23   reasonable and imperfect self-defense, Petitioner claims:

24              [T]he instructions said that a person may act in self-defense or
                defense of another against an imminent threat of harm. However,
25              the instructions said that there is no right to act defen[]sively
                against a threat of "future harm," "no matter how great or how
26              likely" that harm may be.

27              An imminent peril is necessarily a threat of harm in the
                immediately future that is expected to transpire immediately but
28              that has not yet transpired. Action in self-defense against imminent

15

peril is necessarily action taken to prevent harm that has not yet occurred but that is expected to occur in the immediate future unless prevented by defensive action.

Doc. 1 at 14.

Petitioner argues that, as a result, CALCRIM Nos. 505 and 571 violated his right to due process by misstating California law.

Respondent contends that this Court cannot address the state court's construction of California law.  Respondent adds that, in any event, Petitioner cannot claim imminent danger since the shots were fired when Petitioner was safely within a car that was ready to leave the scene of the argument.

**C.      Preparation of Instructions**

At trial, the wording of CALCRIM No. 505 was the subject of protracted discussion, but not with regard to the question of imminent peril.  Throughout preparation of the jury instructions, Pack, through his attorney, Public Defender Robert Wildman, was concerned about differentiating the roles of the three defendants and separating Pack from Petitioner, whom he characterized as the shooter.  Thus, on January 22, 2010, Wildman did not object to the inclusion of CALCRIM No. 505, but contended that the presence of multiple defendants, but a single shooter, required the trial court to tailor CALCRIM No. 505 to reflect that Petitioner shot the gun in defense of himself and the other defendants, whose guilt was derivative of Petitioner's guilt.  "So since they are not the shooters, they can't say, well, I did this in self-defense," he argued.  "They didn't do anything in self-defense.  [Petitioner] did it for them."  8 RT 1854.  Because the prosecutor had not included the text of CALCRIM No. 505 in his proposed instructions, which had been prepared and submitted before Petitioner testified that he had shot the gun, the prosecutor and Wildman agreed to work together to prepare a mutually agreeable form of the CALCRIM No. 505 instruction, tailored to reflect the facts of the case.  They were unable to agree on the instruction.

In the charge conference following the close of evidence in the trial, the prosecutor argued that, in light of testimony that Pack had a gun and that Pack was a shooter, the instructions could not assume that Petitioner was the sole shooter, as Pack contended.  As the prosecutor and

16

1   Wildman debated the wording of CALCRIM No. 505 to reflect the facts of the case, the trial

2   court interrupted and asked whether the defendants had objections to CALCRIM No. 505 other

3   than the opening section.  Wildman replied that he had no problem "with the retreat language

4   coming out so that I have a match with everything else."  9 RT 1944:14-16.  His only concern

5   was with wording the instruction to 'pinpoint[] the theory of the defense," which assumed that

6   Petitioner was the sole shooter and that "he acted in self-defense or defense of the others, not that

7   Pack did, not that Mr. Castenada did, and so they would have no aiding and abetting liability to a

8   codefendant that the jury finds acts in self-defense or defense of others."  9 RT 1944:18-1945:5.

9         Because the prosecution did not agree that the evidence indicated that Petitioner was the

10  sole shooter, the trial court declined to modify CALCRIM No. 505.  The  trial court found that,

11  since the jury could find that Petitioner, Pack, or both were the shooter(s), an attempt to name

12  names in in the instruction would render it unduly confusing.

13        The following morning, after completing discussion of other instructions, the parties

14  returned to consideration of CALCRIM No. 505.  Wildman's suggested language for the self-

15  defense and imperfect self-defense instructions (CALCRIM Nos. 505, 571, 604, and 3470)

16  included pinpoint language naming Petitioner as the shooter.   The prosecutor objected, arguing

17  that inserting Petitioner's name would confuse the jury about how the instruction was to be

18  applied and improperly suggest facts that were not uncontroverted.  The prosecutor contended

19  that despite Wildman's attempts to deny or minimize the evidence that Pack was a shooter,

20  multiple witnesses testified that Pack had fired a gun.  And although Barajas' surprise testimony

21  that he had fired a gun required the prosecution to amend the complaint to conform to proof, it did

22  not remove from consideration other evidence that Pack had fired a gun.  The prosecutor

23  maintained that referring only to Petitioner as the shooter, despite the evidence against Pack,

24  would foreclose the jury's fact finding role.  The trial court elected to use the language submitted

25  by the prosecution, explaining that the defense version was likely to confuse the jury.

26        When the charge conference reached CALCRIM No. 571, Wildman indicated that Pack

27  sought the same modifications as he had requested for CALCRIM Nos. 505, 604, and 3470.  The

28  trial court similarly declined to modify those instructions.

**D.     Instructions as Given**

The trial court provided CALCRIM No. 505 as follows:

> The defendants are not guilty of murder if they were justified in killing someone in self-defense or defense of another.
>
> A defendant acted in lawful self-defense or defense of another if:
>
> One:   The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;
>
> Two:  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;
>
> And three:   The defendant used no more force than was reasonably necessary to defend against the danger.
>
> Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of great bodily injury to himself or someone else.  Defendant's belief must have been reasonable and he must have acted only because of that belief.
>
> The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the killing was not justified.
>
> When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation, with similar knowledge, would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.
>
> "Great bodily injury" means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.
>
> The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of murder.
>
> 11 RT 2384:2 – 11 RT 2385:10.

The trial court provided the following instruction of CALCRIM No. 571:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendants killed someone because they acted in imperfect self-defense or imperfect defense of another.
>
> If you conclude that the defendants acted in complete self-defense or defense of another, their action was lawful and you must find them not guilty of any crime.

18

The difference between complete self-defense or defense of another, and imperfect self-defense or imperfect defense of another, depends on whether the defendant's belief in the need to use deadly force was reasonable.

A defendant acted in imperfect self-defense or imperfect defense of another if:

One, the defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;

And two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

But three, at least one of these beliefs was unreasonable.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"Great bodily injury" means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder.

11 RT 2390:5 - 11 RT 2391:9.

None of the defendants objected to the jury instructions after the judge presented them.

### E.    Court of Appeal Decision

Petitioner and Pack first asserted on appeal that CALCRIM Nos. 505 and 571 misstated the concept of imminent peril. The Court of Appeal disagreed, finding that California law was settled:

For either perfect or imperfect self-defense, the defendant's fear must be of imminent harm. (*People v. Humphrey* (1996) 13 Cal. 4th 1073, 1082.) "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal. 4th 768, 783 (*Christian S.*).) The essence of this legal principle is contained in CALCRIM Nos. 505 and 571 by virtue of their requirement that the defendant must have believed "the immediate use of deadly force was necessary to defend against" the danger.

In *People v. Lopez* (2011) 199 Cal. App. 4th 1297, this court held that perfect or imperfect self-defense required a fear of imminent harm; future harm would not suffice. (*Id.* at pp. 1305-1306.) We

19

also held that the trial court was not required to define "imminent harm" because the jurors' common understanding of the term was all that was required for an understanding of the relevant legal principles. (*Id.* at 1307.)  We concluded in *Lopez* that CALCRIM Nos. 505 and 571 correctly stated the law. (*Lopez*, at p. 1307.)

*Pack*, 2012 WL 1958866 at *5.

The state court rejected Petitioner's claim that CALCRIM Nos. 505 and 571 misinstructed the jury and found no reasonable likelihood that the jurors failed to understand the difference between imminent danger and future danger or that the instructions prevented the jury from applying the theory of imperfect self-defense. *Id.* at *6.

### F.   <u>State Law Issue</u>

In his federal petition, Petitioner attempts to confuse the concepts of "imminent harm" and "future harm" in an effort to circumvent settled state law regarding jury instructions on self-defense and imperfect self-defense.  A petitioner may not circumvent the state court's determination of a state law question by re-characterizing it as a violation of due process. *Langford*, 110 F.3d at 1389.  Petitioner attempts to accomplish precisely this recharacterization, writing, "To the extent that it is a state law error, this instructional error violates the federal constitutional guarantee of substantive due process." Doc. 1 at 15.

Petitioner never contended at trial that the shot was fired to protect the defendants from future harm.  Instead, the defense claimed imminent harm, seeking to convince the jury that one or more individuals in the soccer group had threatened the defendants either by reaching for a gun hidden in his waistband or by "lunging" at one of the defendants.  According to the defense theory, the shooter had fired into the soccer group only after it surrounded the defendants' car to prevent defendants from fleeing the scene.  Defendants' attempts to characterize the shooting as self-defense were overshadowed by evidence contrary to their theory, including multiple witnesses who declined to accept defense counsels' attempts to elicit testimony that defendants had been threatened and the dramatic recording of the entire incident by the liquor store security camera.  The tape clearly showed that the shots were fired after the defendants' car had backed out of its parking space toward the area in which the soccer group was congregated.  Instead of taking the open route to the street and safety, the car paused, and an occupant fired into the soccer

20

group.  Multiple witnesses testified that Pack stood in the open door of the front passenger compartment and taunted the soccer group by stating, "We got you," just before Petitioner began shooting.

To prevail in a collateral attack on state court jury instructions, a petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72.  Petitioner does not do so.  The Court should decline to second-guess the state court's resolution of this state law question.

**VII.    Sufficiency of the Evidence**

Petitioner contends that his due process rights were violated by his second-degree murder conviction upon insufficient evidence.  According to Petitioner, because the record established that the Oseguera brothers and their friends were the initial aggressors and that the defendants had no malice and sought only to scare off the "menacing mob," the record was not sufficient to prove that defendants acted with malice, a requisite element of second-degree murder.  Petitioner adds that the facts supported a finding of imperfect self-defense.

**A.    Second-Degree Murder**

"Murder is the unlawful killing of a human being . . . with malice aforethought." Cal. Penal Code § 187(a).  "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or any other kind of willful, deliberate, and premeditated killing, or which is committed in perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem kidnapping, trainwrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree.  All other kinds of murders are of the second degree." Cal. Penal Code §189.  Put another way, "[u]nder California law, "[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" *White v. Ollison*, 592 F.Supp.2d 1227, 1239 (C.D.Cal. 2008)

21

(quoting *People v. Knoller*, 41 Cal. 4th 139, 151 (2007).

The trial court instructed the jury that it could convict a defendant of first degree murder under either of two theories: (1) "the murder was willful, deliberate, and premeditated"; or (2) "the murder was committed by shooting a firearm from a vehicle intentionally at a person outside the vehicle with the intent to kill that person."  11 RT 2386:18-22.  The Court stated:

> Provocation may reduce a murder from first degree to second degree, and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.
>
> If you conclude that the defendants committed murder, but were provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also consider the provocation in deciding whether the defendant committed murder or manslaughter.

11 RT 23 88:11-19.

**B.**      **State Court Decision**

The Court of Appeal refused "to reweigh the evidence and to conclude as a matter of law that [defendants] are not guilty of murder."  *Pack*, 2012 WL 1958866 at \*9.  Applying the California standard of review required the court to review the record as a whole in the light most favorable to the judgment to determine whether reasonable, credible, and solid evidence existed from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*  The court concluded that the defendants' convictions were supported by such evidence:

> [T]he evidence showed that when Kevin and his friends went to the taco truck to order food, defendants shouted insults at them. Castenada pulled a gun from his waistband and pointed it at Kevin and his group of friends, telling them to back away.  Kevin and his friends began slowly backing away.  Castenada, Pack and [Petitioner] then went to their car, got in, and drove slowly by Kevin and his friends.  Pack shouted out, "We got you," and [Petitioner] leaned out of the rear passenger door, pointed a revolver at Kevin and his friends, and fired shots toward them. When the shots were fired, Kevin and his friends were about 40 to 50 feet away from the car carrying defendants.  No one in the group of victims had a weapon or pretended to have a weapon.
>
> Although the evidence shows that there were insults thrown and an altercation between the two groups, the altercation clearly was instigated by Pack, [Petitioner], and Castenada.   There is no evidence suggesting Kevin or any of his friends provoked a quarrel. The provocation that "incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, and it must be

22

sufficiently provocative that it would cause an ordinary person to act rashly and without due deliberation. (*People v. Moye* (2009) 47 Cal. 4th 537, 549-550.)   We do not view the evidence as establishing, let alone conclusively establishing, provocation that would incite an ordinary person to homicidal conduct. (*Id.* at pp. 550-552.)

There also is little to no evidence defendants acted in the actual, but unreasonable, belief in the need to defend themselves. Kevin and his friends were unarmed, and no one in the group pretended to be armed, and they were standing 40 feet or more away from defendants, while defendants were in a car and driving away at the time the shots were fired. (*Christian S.*, *supra*, 7 Cal. 4th at pp. 771, 773; see *People v. Lewis* (2001) 25 Cal. 4th 610, 645.)

*Pack*, 2012 WL 1958866 at * 9-10.

## C.   Federal Standard of Review

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998).  It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

When this standard is applied, there is little doubt that Petitioner's conviction was supported by substantial evidence.  The state court accurately summarized the evidence establishing Petitioner's guilt: this Court need not repeat the same facts.  That Petitioner can point to evidence which would support a contrary conclusion does not defeat the verdict.  "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

23

In sum, when viewed in the light favorable to the jury's verdict, the evidence was sufficient to support Petitioner's conviction.  The Court should, therefore, deny habeas relief based on insufficiency of the evidence.

**VIII.** **Victim Restitution**

Petitioner contends that the trial court erred in failing to designate the victim restitution as a joint and several liability.  The Court has no habeas jurisdiction over an order of restitution since such an order does not satisfy the custody requirement set forth in 28 U.S.C. § 2254(a). *Bailey v. Hill*, 599 F.3d 976, 978 (9th Cir. 2010).  Accordingly, the Court should dismiss this claim for lack of jurisdiction.

**IX.** **Ineffective Assistance of Counsel**

In his motion for an order of stay and abeyance, Petitioner conceded that he had not exhausted this claim in the state courts.  This Court denied the motion for stay and abeyance. Accordingly, the Court should dismiss this claim as unexhausted.

**X.** **Cumulative Error**

If the Court agrees with the findings and recommendations of the undersigned, it need not reach the claim of cumulative error.

**XI.** **Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)   (1) Unless a circuit justice or judge issues a certificate of

24

appealability, an appeal may not be taken to the court of appeals from—

> (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his  . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court declines to issue a certificate of appealability.

## XII.   Conclusion and Recommendation

The undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty**

**(30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 13, 2016**                    /s/ *Sheila K. Oberto*
                                         UNITED STATES MAGISTRATE JUDGE

26